UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                            Case No. 17-CR-111

JIMMY L. DESOTELL,

    Defendant.

**ORDER DENYING MOTION TO SUPPRESS**

Defendant Jimmy Desotell is charged in a Superceding Indictment, along with several others, with Conspiracy to Distribute and Possess with Intent to Distribute 500 Grams or more of Methamphetamine in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). Desotell is also charged in a second count with Knowingly Using and Carrying a Firearm During and in Relation to a Drug Trafficking Crime in violation of 18 U.S.C. § 924(c)(1)(A). The charges arise, at least in part, out of the May 30, 2017 search of Desotell's backpack and drawstring bag by officers of the Green Bay Police Department. The case is presently before the court on Desotell's motion to suppress the evidence obtained in the search as well as any other evidence derived therefrom. Desotell contends that the drugs, scales, packaging material, and gun found in his backpack must be suppressed because the search conducted by the police was in violation of his Fourth Amendment rights. For the reasons that follow, the motion will be denied.

**FACTS**

This case arises out of Desotell's misfortune in placing his bags in a borrowed van that had been used in a retail return fraud scheme several hours earlier. At approximately 6:00 p.m., the Green

Bay Police Department received a call reporting a retail theft at Kohl's Department Store located in Green Bay, Wisconsin. At approximately 7:40 p.m., Green Bay Police Officer Michael Knetzger, who began his shift at 7:00 p.m., arrived at the store to investigate the complaint. Officer Knetzger was informed by the store manager that a person had entered the store and committed what was generally referred to as a return fraud where merchandise on display is taken to the return desk and returned for cash. More specifically, according to the report, a male suspect was seen selecting a pair of Nike sandals, size 8, valued at around $30. The suspect then took the sandals to the return desk where he received a cash refund for a purchase he had never made. The store manager described the suspect as a male, Native-American, who had various tattoos and was wearing a red shirt. The manager also provided Officer Knetzger with a surveillance photo of the individual. The store manager told Officer Knetzger that the loss prevention officer had attempted to stop the individual, but he left the store and got into the passenger side of a vehicle which then fled heading east. The vehicle was described as a red Saturn VUE SUV with a license plate 180-ZLE / WI.

Officer Knetzger ran the plate and learned that the Saturn VUE SUV was registered to Larissa Lucas who lived at 1126 Pine Street in Green Bay. Officer Knetzger drove by Lucas' address but the SUV was not there. The Police Department's database listed Allejandro Cantu, who lived on Red Tail Drive in Outagamie County, as Lucas' boyfriend. Officer Knetzger had Outagamie County officers check that address and was told Cantu was not there. Officer Knetzger continued with his other duties but checked back at Lucas' residence shortly before 11:00 p.m. At that time he observed that red VUE SUV in the parking lot behind the building where Lucas lived. Desotell was seated in the driver's seat with the front door open, and Lucas was leaning into the back passenger area to retrieve her young son from his car seat. Officer Knetzger called out his location, and cover officers were immediately dispatched to assist.

2

Officer Knetzger immediately realized that Desotell was not Cantu and told him he was not the person he was looking for. Given the report that Cantu was Lucas' boyfriend and he had been seen fleeing in her car with someone else driving, however, Officer Knetzger regarded her as a suspect as well as Cantu. Officer Knetzger told Desotell that once he was shown identification and made sure there were no active warrants for his arrest, he would be free to leave. Despite being told he was not the person police were looking for, Desotell appeared nervous and fidgety.

Shortly thereafter, Officers Keith Rager and Aaron Walker arrived for back-up, and Officer Knetzger briefed them on what was going on. He then ran Desotell's name through the state database and upon learning there were no outstanding warrants for him, told him he was free to go. Officer Walker also noticed that Desotell appeared "extremely agitated and fidgety" and eager to end the contact with the officers. Officer Walker knew that the area was one where drug activity was common and based on Desotell's behavior and the poor lighting in the parking lot, he conducted a brief frisk of Desotell to see if he had any weapons on his person. None were found.

At about the same time, Officer Knetzger explained to Lucas that he was investigating a retail theft incident involving her vehicle and that they had been looking for Cantu at the Red Tail Drive address. Lucas said that she had just dropped him off there but the people police talked to would likely not tell them he was there for fear of getting him in trouble. At Officer Knetzger's request, Lucas also gave him permission to search her vehicle for evidence of the retail theft. At some point, Lucas also offered to go into her residence and get the sandals that she had previously purchased, the receipt for which Cantu had used to obtain the fraudulent refund.

Officer Knetzger testified that the evidence he was looking for included the receipt that was used to commit the fraud and perhaps others, and possibly the precise amount of money that Cantu

3

had received from the store, as well as the red shirt he was wearing at the time. Even though he was given consent, Officer Knetzger also believed he had probable cause to conduct the search since Cantu was observed leaving the store in the vehicle. Based on his experience investigating that type of crime, Officer Knetzger believed Cantu would have received a receipt of the transaction. Because he intended to search the van for the receipt and the other possible evidence of the retail theft, Officer Knetzger refused to let Desotell drive off in the SUV even though he said Lucas was letting him borrow it.

At that point, Lucas asked Officer Rager to retrieve her son's blanket from the back of the van. Officer Ragar opened the back hatch and observed that the back area was full of clothing and other items, though he did not conclude it was store merchandise. He retrieved the blanket and handed it to Lucas. Officer Knetzger then went with Lucas into the residence so she could hand her child over to her mother, who was staying there. With the hatch still open, Desotell reached inside and grabbed two bags that were in the back cargo area. One of the bags was a backpack; the other, a Nike bag with a drawstring. Officer Rager stopped him and took possession of the bags so that they could search them. The Nike bag was heavy, and Officer Rager asked Desotell what was inside. Although Desotell had just claimed that he owned the bags, he said he did not know what they contained. Officer Rager asked Desotell if he could search the bags for stolen property, but Desotell did not respond.

After retrieving the bags from Desotell, Officer Rager saw into the top opening of the bag with the drawstring what appeared to be a pistol case. Moving it aside, he saw a silver and black pistol. Upon searching further, Officer Rager found a large quantity of what was later determined to be methamphetamine inside the pistol case. Desotell was then placed under arrest.

4

In the meantime, Officer Walker, who had commenced searching at the driver's side of the vehicle, observed a used syringe underneath the driver's seat and recognized its significance to the possible presence of drugs. Immediately thereafter, Officer Walker heard Officer Rager direct Desotell to place his hands behind his back and moved to the rear of the vehicle where he saw the open Rager gun case with the white crystalline material in it and the handgun at the bottom of the bag. After Desotell was handcuffed, Officer Walker resumed his search of the front seat area and found another syringe containing a clear liquid and other used syringes. He also found a bag of crystalline powder in the front passenger seat.

## ANALYSIS

The Fourth Amendment protects individuals against unreasonable governmental searches and seizures. U.S. Const. Amend. IV. Although the text of the Fourth Amendment does not state as much, the Court has construed it as in general requiring that a warrant issued by a neutral magistrate authorize any search or seizure of an individual's person, house, papers or effects. *Kentucky v. King*, 563 U.S. 452, 459 (2011). An exception to the warrant requirement exists when exigent circumstances are present. Such circumstances exist when a law enforcement officer has probable cause to believe that a motor vehicle he has stopped contains evidence of a crime. *Carroll v. United States*, 267 U.S. 132 (1925). Further, "[i]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825 (1982). This includes "passenger's belongings found in the car that are capable of concealing the objects of the search." *Wyoming v. Houghton*, 526 U.S. 295, 307 (1999).

Applying these principles to the facts of this case, I conclude that the search of Desotell's bags was reasonable. Officer Knetzger had probable cause to believe that Lucas' vehicle might contain evidence of the retail theft or return fraud that had taken place earlier that evening. There was more than enough evidence to link the vehicle to the crime. Store employees had seen Cantu take a pair of sandals from the display area of the store and obtain a refund using a receipt from a previous purchase by his girlfriend. As they attempted to stop him, he left the store and jumped into the passenger seat of Lucas' red Saturn VUE which then fled the area traveling east. The crucial question is whether there was probable cause to believe that when Officer Knetzger came upon the SUV in the parking lot of Lucas' residence, it would contain evidence of the return fraud committed several hours earlier.

Probable cause exists where based on the totality of the circumstances "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "A police officer has probable cause to conduct a search when the facts available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." *Florida v. Harris*, 568 U.S. 237, 243 (2013) (internal quotations and brackets omitted). The test for probable cause is not reducible to "precise definition or quantification." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). Probable cause "requires only a probability, not absolute certainty, that evidence of a crime may be found." *United States v. Farmer*, 543 F.3d 363, 377 (7th Cir. 2008); *see also United States v. Funches*, 327 F.3d 582, 587 (7th Cir. 2003) ("Determinations of probable cause are naturally based on probabilities, and a finding of probable cause does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime." (internal quotations

6

omitted)). Finally, it is important to note that "[i]n making probable-cause determinations, law enforcement agents are entitled to draw reasonable inferences from the facts before them, based on their training and experience." *Funches*, 327 F.3d at 586.

Officer Knetzger testified that he believed there was probable cause to search for the $30 he believed Cantu received in the fraudulent transaction and the receipt. He also testified that Cantu might have removed the red shirt he was wearing and left that in the SUV. I am unable to find probable cause as to either the money or the shirt. Even if thirty dollars had been found in the SUV, there would have been no reason to connect it with the refund fraud. The money Cantu received from the store was not marked, nor were the serial numbers on the bills prerecorded. Money is so common that without some way of connecting it to the crime, its presence in the SUV was of no significance to whether Cantu and Lucas had committed the crime. The red shirt might have been relevant, but there is no reason to believe Cantu would have removed it and left it in the SUV. This was not an armed bank robbery that they committed with the expectation that police would be in hot pursuit. It was a $ 21 return fraud to which it took police more than an hour to respond. There was no reason to believe Cantu had an extra shirt with him into which to change. I do find, however, that there was probable cause to believe a receipt for the transaction might be found in the SUV.

Officer Knetzger knew from his personal experience that a receipt from the store would be associated with a refund transaction. Cantu had fled in Lucas' SUV only several hours earlier. He obviously did not need to retain the receipt he received and/or used in the transaction. Under these circumstances, it was reasonable for Officer Knetzger to conclude that the receipt would be found in the vehicle in which Cantu, with Lucas' assistance, had fled the scene. Cantu likely would have discarded it after they left the store, or placed it in his pocket. The fact that he might have placed it

7

in his pocket, however, does not mean there was not probable cause to believe that it was still in the SUV. The fact that there may have been probable cause to believe that the evidence was still on Cantu's person does not mean probable cause was lacking as to the SUV. *See United States v. Burkhart*, 602 F.3d 1202, 1208 (10th Cir. 2010) ("Probable cause means that a fair probability exists that the evidence to be seized will be found in a particular place, not absolute certainty to the exclusion of all other places."). Based on the totality of the circumstances, there was a fair probability that the receipt of the transaction would be found in Lucas' SUV. Though there was little reason to believe that the receipt would have been concealed in the bags in the back of the vehicle, *Wyoming v. Houghton* created the bright-line rule that "police officers with probable cause to search a car may inspect passengers' belongings found in the car that are capable of concealing the object of the search." 526 U.S. at 307. The search of Desotell's bag and backpack was therefore valid.

It is also true that Lucas gave consent to search her SUV. A warrantless search can be lawfully performed with the voluntary consent of someone with authority to give such consent. *Georgia v. Randolph*, 547 U.S. 103, 110 (2006). Although Lucas suggested in her testimony that her consent was given reluctantly, no evidence was offered to show it was coerced. The unrefuted testimony of the officers is that she consented on more than one occasion. Based on the evidence presented, I find that Lucas' consent to search her vehicle was voluntary. Thus, even without probable cause, the officers could lawfully search the SUV.

But this does not mean they could lawfully search Desotell's bag and backpack based on Lucas' consent. Lucas had authority to consent to the search of her vehicle by virtue of her ownership interest in it. She was not the owner of the bag and backpack in the back of the vehicle, however. While it might have been reasonable for the officers to believe the consent she gave

8

extended to everything in the SUV—that she had apparent authority to consent—once Desotell claimed he was the owner of the bags, they could not have reasonably proceeded on that assumption without first asking Lucas whether it was true. *See United States v. Basinski*, 226 F.3d 829, 834 (7th Cir. 2000) ("For purposes of searches of closed containers, mere possession of the container by a third party does not necessarily give rise to a reasonable belief that the third party has authority to consent to a search of its contents."). "Rather, apparent authority turns on the government's knowledge of the third party's use of, control over, and access to the container to be searched, because these characteristics are particularly probative of whether the individual has authority over the property." *Id.* Since in fact Desotell was the owner of the bag and backpack and he did not consent, police could not lawfully search his property based on Lucas' consent to search her vehicle.

At the same time, it was not unreasonable for Officer Rager to stop Desotell from simply walking away with the bags without first determining that he owned them. As he explained, he was not sure whether the bags belonged to Desotell or to Lucas. Thus, Officer Rager took hold of the bags and placed them back in the cargo area. As he did so, he noticed through the opening at the top of the Nike bag a gun case. Officer Rager testified that he recognized the gun case based on his own experience in the military and the fact that he owned several similar guns himself. Although counsel for Desotell suggested in his questioning of Officer Rager that he opened the bag in order to look inside before he recognized the gun case, I find that did not occur. Officer Rager noticed the opening in the bag when he grabbed it back from Desotell and did not intentionally manipulate the bag so he could peer inside it. And since Desotell had previously denied having any weapons, further inquiry was justified.

9

At about the same time, Officer Walker found a used syringe on the floor under the driver's seat of the vehicle. This discovery, along with the other circumstances, gave rise to probable cause to believe there may be drugs in the vehicle. Although Officer Walker had not yet communicated his discovery of the used hypodermic needle and other evidence of drugs to Officer Rager before Officer Rager looked in the bag and discovered the gun and drugs, the events were so close in time that it would be unreasonable to conclude that Desotell would have left the scene before probable cause to search his bags arose. Moreover, "when officers are in communication with each other while working together at a scene, their knowledge may be mutually imputed even when there is no express testimony that the specific or detailed information creating the justification for a stop was conveyed (though of course the information actually possessed by the officers must be sufficient to justify the stop or arrest)." *United States v. Nafzger*, 974 F.2d 906, 911 (7th Cir. 1992); *see also United States v. Parra*, 402 F.3d 752, 764 (7th Cir. 2005) (same). Thus, at or about the time Officer Rager opened Desotell's bag, there was probable cause to believe the SUV contained drugs. "On this night and at this spot it would be hypertechnical to insist on bifurcating the knowledge of the officers and isolating [Officer Rager] from the realities of the existing situation." *United States v. Ragsdale*, 470 F.2d 24, 30 (5th Cir. 1972). Again, in light of this fact, police were authorized to conduct the search under the reasoning of *Wyoming v. Houghton*.

Accordingly and for the reasons stated above, Desotell's motion to suppress is denied.

**SO ORDERED** at Green Bay, Wisconsin this  19th  day of April, 2018.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court